303 Ga. 245
FINAL COPY



S17A1892. JACOBS v. THE STATE.


MELTON, Presiding Justice.

Following a jury trial, John Alan Jacobs was found guilty of malice

murder, felony murder, aggravated assault, and possession of a firearm during

the commission of a felony in connection with the shooting death of his wife,

Harriette.[1] On appeal, Jacobs contends that the trial court erred in allowing

---

[1] On July 7, 2015, Jacobs was indicted for malice murder, felony murder predicated on aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony. Following an October 5-8, 2015 jury trial, Jacobs was found guilty on all counts. On October 9, 2015, the trial court sentenced Jacobs to life imprisonment without the possibility of parole for malice murder and five consecutive years for possession of a firearm during the commission of a felony. The trial court purported to merge the remaining counts for sentencing purposes. However, with respect to the felony murder count, this count was actually "vacated by operation of law" rather than "merged" with the malice murder count for sentencing purposes. See Malcolm v. State, 263 Ga. 369 (4) (434 SE2d 479) (1993). Jacobs filed a motion for new trial on October 27, 2015, which he amended on November 18, 2016. Following a December 13, 2016 hearing, the court denied the motion on December 27, 2016. Following the payment of costs, Jacobs' timely appeal was docketed in this Court for the August 2017 term and submitted for decision on the briefs.

certain statements of Harriette to be admitted at trial under the residual hearsay exception contained in OCGA § 24-8-807; that the trial court erred in its instruction on good character evidence; and that his trial counsel was ineffective. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the jury's verdict, the evidence presented at trial revealed that Harriette had filed for divorce from Jacobs after discovering that he had been cheating on her. On October 10, 2014, six days before the couple was scheduled to appear in court in connection with the divorce proceedings, police responded to a call to Jacobs' home. Jacobs met police at the gate of his home and informed them that he had returned home from a festival to find his wife sitting in a rocking chair on the couple's back porch, dead from an ostensibly self-inflicted gunshot wound through her cheek. However, the investigation at the scene revealed that the area had been staged to look like a suicide rather than a murder. Specifically, despite the large amount of blood that had dried and congealed around the place where Harriette's body was seated, the gun found on the floor beside Harriette and near Harriette's outstretched right arm was "essentially clean" and had almost no blood on it, indicating that, according to one of the State's experts, the gun had been placed

2

on the floor "well after the bloodshed event [had] stopped." There was also a coffee stain on Harriette's shirt and a coffee cup, which was turned upside down, on the wood floor on the opposite side of Harriette from where the gun was found. But, much like the gun found at the scene, there were no bloodstains on the coffee cup. This showed that the cup had also been placed where it was found after the blood had stopped flowing from Harriette's wound. There was also a blood transfer stain on the right hand arm of the rocking chair that Harriette was sitting in, indicating that Harriette's right arm had originally been resting on the arm rest of the chair while she was in a natural sitting position, and then her arm was moved after it became saturated with blood. Harriette's hands also tested negative for gunshot residue, and the State's medical examiner determined that, based on gunpowder stippling, Harriette had to have been shot from a minimum distance of six inches away. The .38 caliber revolver used to kill Harriette was owned by Jacobs, and he kept this gun hidden behind a portrait of a family member in the master bedroom of the house.

When Jacobs was questioned by the GBI, one of the agents noticed drops of what appeared to be blood on Jacobs' shoe. This led to a forensic examination of Jacobs' clothes, which revealed twenty drops of Harriette's blood on Jacobs'

3

left pant leg and ten drops of her blood on his right pant leg, and revealed that the drops of blood on his shoes came from Harriette's body. The lead GBI agent who investigated the crime scene testified that the drops on Jacobs' clothing appeared to have been caused by Harriette's blood dripping from her body, striking the blood already pooling on the ground, and splashing onto Jacobs.

At trial, the trial court allowed various witnesses who were close friends and confidantes of Harriette to testify about statements allegedly made to them by Harriette before she died. Specifically, a "really good friend[ ]" of Harriette's, Marilisse Mars, who had known Harriette through church for years and with whom Harriette had confided about her life, testified that Harriette told her that she was worried and afraid, and that if anything ever happened to Harriette, Jacobs would have been the one who did it. Mars also testified that Harriette told her that, no matter what it might look like, Harriette would never hurt herself. Another witness, Patricia Briscoe, who had been close friends with Harriette since 1993 and with whom Harriette would sometimes spend the holidays, testified that Harriette expressed to her that she was concerned for her own safety, because Jacobs had said that he would throw Harriette into a pond or put her in the woods where no one would ever find her. Briscoe even gave

4

Harriette a set of keys to her sister's house in case Harriette felt unsafe at home and needed a place to stay. Briscoe also testified that Harriette instructed her to "go to the highest mountaintop and yell and scream and tell the world" that Harriette did not hurt herself, if anything ever happened to Harriette. A third close friend, Kimberly Dawn Jacobs, met Harriette in 1974, and she and Harriette were "like sisters" going to school together in high school. Dawn Jacobs reconnected with Harriette at a high school reunion in 2013, and the two remained "like sisters," communicating several times per week and sharing about their "day to day lives, [their children], what was going on personally, [and] everything." Dawn Jacobs testified that Harriette told her that Jacobs said he could make Harriette disappear and never be heard from again; that Jacobs would disinherit their children; that Jacobs would stop paying for the children's schooling if Harriette ever left him; and that Jacobs said that he did not mind going to prison. Another witness, Chip Allgood, met Harriette when she was fifteen and he was eighteen, and he reconnected with her through Facebook in 2014. After several conversations and getting closer to each other over time, she began having an affair with Allgood. Allgood testified that Harriette told him that Jacobs was very controlling in their relationship and that she only stayed in

5

the relationship as long as she did because she was afraid that her children would not receive financial help if she left him. Allgood also testified that Harriette told him that she had gotten into a scuffle with Jacobs at one point where Jacobs became physically violent with her. In this regard, evidence was also introduced at trial which revealed that Harriette had called the police to her home on two occasions where she was involved in domestic disputes with Jacobs. In one of these disputes, which Harriette also revealed through text messages to Mars, the couple had gotten into a physical fight. Harriette spent the night at Dawn Jacobs' home after this incident. Harriette and Jacobs' son also testified at length about witnessing Jacobs' controlling nature over Harriette.

The evidence was sufficient to enable a rational trier of fact to find Jacobs guilty of all of the crimes of which he was convicted beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Jacobs claims that the trial court erred by admitting into evidence at trial the statements that Harriette made to Mars, Briscoe, Dawn Jacobs, and Allgood. We disagree.

The admissibility of the statements in question is governed by the residual hearsay exception contained in OCGA § 24-8-807 ("Rule 807") of Georgia's

new Evidence Code. That Code section states in relevant part:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that: (1) The statement is offered as evidence of a material fact; (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence. . . .

Jacobs does not dispute that all of the statements at issue were offered as evidence of material facts; that they were more probative on the points for which they were offered than other evidence which could have been procured through reasonable efforts; and that the general purpose of the rules of evidence and the interests of justice would best be served by admission of the statements into evidence. He contends only that the statements did not have sufficient "guarantees of trustworthiness" in order to be admissible under the residual hearsay exception. Jacobs is incorrect.

In interpreting Rule 807, we must bear in mind that

> [i]n 2011, our General Assembly enacted a new Evidence Code, of which Rule [807] is a part. Many provisions of the new Evidence Code were borrowed from the Federal Rules of Evidence, and when our courts consider the meaning of these provisions, they look to decisions of the federal appeals courts construing and applying the

7

Federal Rules, especially the decisions of the Eleventh Circuit. See Parker v. State, 296 Ga. 586, 592 (3) (a) (769 SE2d 329) (2015).

State v. Frost, 297 Ga. 296, 299 (773 SE2d 700) (2015). Here, Georgia's Rule 807 is based on Federal Rule of Evidence 807, and it is not a Rule that has been carried over from Georgia's old Evidence Code. Compare Rule 807 with Fed. R. Evid. 807 and former OCGA § 24-3-1 (describing former "necessity" exception to rule against hearsay).

With respect to the hearsay exception contained in Rule 807, this

residual hearsay exception was designed "'to be used very rarely, and only in exceptional circumstances.'" (Citations omitted.) Rivers v. United States, 777 F3d 1306, 1312 (II) (11th Cir. 2015). The rule applies "'only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present.'" Id. Such guarantees must be "equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, and statements of personal or family history." [Cit.] These categories of hearsay "have attributes of trustworthiness not possessed by the general run of hearsay statements that tip the balance in favor of introducing the information if the declarant is unavailable to testify." [Cit.] And they are all considered sufficiently trustworthy not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made. For example, a dying declaration is trustworthy enough to admit as evidence in certain types of cases because at the time the declaration is made, the declarant believes that she is about to die and the statement concerns the cause of her death — in other words, because of the particular circumstances surrounding the original utterance of the

8

statement. (Citations omitted.) Id. at 1314.

(Punctuation omitted.) Smart v. State, 299 Ga. 414, 421-422 (3) (788 SE2d 442) (2016).

In Smart, supra, this Court applied Rule 807 in a very similar situation to that of the instant case to uphold the trial court's admission into evidence of statements from the deceased victim that she made to friends and family members regarding domestic abuse. The victim in Smart was found dead in her home after her husband had called 911 claiming that he had come home to find his wife passed out. Further investigation revealed, however, that the husband had beaten his wife to death. Prior to her death, the victim told a close friend about an incident where her husband had "slashed a tire on [her] truck," and also told the friend about the anxiety she felt about her husband returning home while she had a friend in the house. The victim told another friend that, "approximately seven months before the murder, . . . [her husband] had beaten her with a suitcase when she announced her intention to leave the marriage." The victim had also written "letters to God," "in which she described her tumultuous and abusive relationship with her husband; and [she sent] numerous text messages . . . to various family and friends regarding her relationship with

9

[him]." Id. at 419-420 (3).

As was the case in Smart, the statements and text messages involved here consistently speak to Jacobs' abusive, controlling, and violent behavior toward Harriette during their marriage and during her efforts to leave him, and Harriette's own anxiety connected to her husband's threats and abusive behavior. Furthermore, just as the appellant argued in Smart, Jacobs contends here that the evidence in question lacks the "exceptional guarantees of trustworthiness" to be admissible under Rule 807. See id. at 422 (3). However, this Court held in Smart that the trial court did not commit plain error by allowing the evidence to be admitted at trial, finding that

> [w]e cannot say that statements from a wife to her friends . . . or her own writings, which describe acts of domestic violence, do not, in fact, bear an increased level of trustworthiness. Likewise, in light of the often-secretive nature of domestic violence, we can also envision that such statements might be highly probative.

Id. at 422 (3).

While our review in Smart was for plain error (see id. at 419-422 (3) (reviewing admission of Rule 807 evidence for plain error in light of appellant's failure to properly object in the trial court)), and our review here is for abuse of discretion (see, e.g., Anglin v. State, 302 Ga. 333 (2) (806 SE2d 573) (2017)),

10

we nevertheless find the reasoning in Smart to be persuasive. Specifically, we conclude that the trial court did not abuse its discretion in determining that the statements from Harriette to her friends and her own text messages describing the nature of her abusive relationship with Jacobs prior to her death had the requisite "exceptional guarantees of trustworthiness" to be admissible at trial pursuant to Rule 807. See Smart, supra. Indeed, in light of the secretive nature of domestic abuse, we are not convinced here that the statements from Jacobs' "wife to her friends . . . or her own writings, which describe acts of domestic violence, do not, in fact, bear an increased level of trustworthiness." Id. at 422 (3).[2] In this connection, we also find no abuse of discretion in the trial court concluding that Harriette's statements about the abusive threats that her husband made to her, the fact that she would not harm herself, and her fears that Jacobs might do something to her carried the requisite guarantees of trustworthiness to be admissible, as those statements also stemmed from the very domestic abuse about which she had been informing her close confidantes. See id.

---

[2] In this regard, we do not find Jacobs' reliance on Carr v. State, 267 Ga. 701 (3) (482 SE2d 314) (1997) to be persuasive. Carr is distinguishable from the instant case, as it was decided under former OCGA § 24-3-1, not Rule 807, and the statements made in Carr did not relate to allegations of domestic abuse.

11

3. Jacobs asserts that the trial court committed plain error in its charge to the jury on good character evidence[3] and that the trial court allegedly commented on the evidence through this charge. See OCGA § 24-4-405 (a) ("In all proceedings in which evidence of character or a trait of character of a person is admissible, proof shall be made by testimony as to reputation or by testimony in the form of an opinion."); OCGA § 17-8-57 (a) (1) ("It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused."). With respect to the jury charge given, in order to satisfy the test for plain error,

> [f]irst, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously

---

[3] Because Jacobs did not object to this jury charge at trial, our review of this issue is limited to an analysis for plain error. See, e.g., Clark v. State, 299 Ga. 552 (2) (787 SE2d 212) (2016).

12

affects the fairness, integrity, or public reputation of judicial proceedings.

(Citations, punctuation and emphasis omitted.) State v. Kelly, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). "In the case of a review for 'plain error,' it is not sufficient to find actual legal error, 'as the jury instruction in question must have an obvious defect rather than a merely arguable defect.'" Hoffler v. State, 292 Ga. 537, 542 (4) (739 SE2d 362) (2013), citing Terry v. State, 291 Ga. 508, 509 (2) (731 SE2d 669) (2012).

The jury charge in question stated:

Now, you have heard evidence of the character of the defendant and his character for a particular trait, more specifically violence, in an effort to show that the defendant likely acted in keeping with such character or trait at pertinent times or with reference to the issues in this case. This evidence has been offered in the form of opinion of other witnesses. You should consider any such evidence along with all the other evidence in deciding whether or not you have a reasonable doubt about the guilt of the accused.

Now, good character is not just a witness credibility issue, nor is it an excuse for crime. However, you may consider it as weighing on the issue of whether or not the defendant is guilty of the charges in the indictment.

Jacobs contends that the charge was erroneous because it used the word "violence" to describe the character trait allegedly at issue in Jacobs' trial, which

13

speaks to a bad character trait rather than a good one. However, when considered in the context of the actual evidence presented at trial, and in the context of the entire charge on good character, we find no error. Specifically, Jacobs' counsel made a point of asking each and every one of Jacobs' four character witnesses at trial if they knew Jacobs to be "violent or aggressive" or if he acted "violently or aggressively," to which each of the witnesses replied "no." Jacobs himself used the idea that he did *not* have a reputation for "violence" as a means of attempting to show his good character, and the trial court merely reflected that in its charge to the jury. The jury was properly left to determine whether Jacobs would have acted consistently with his purported character with respect to "violence," which was to *not* act violently toward anyone, including Harriette. In this manner, the jury charge was adjusted to the specific evidence presented in this case. See, e.g., Rector v. State, 285 Ga. 714, 716 (5) (681 SE2d 157) (2009) (trial court did not err by giving charge that was an accurate statement of the law as adjusted to the evidence that in no way confused the jury when placed in context of entire jury charge). We find that the jury would not have been confused from the charge given under the circumstances here, and no error, let alone plain error, from the trial court giving

14

it. See, e.g., <u>Branchfield v. State</u>, 287 Ga. 869 (3) (700 SE2d 576) (2010). Nor would the giving of this proper charge somehow amount to the trial court commenting on the evidence. See <u>Faust v. State</u>, 302 Ga. 211, 216 (3) n.7 (805 SE2d 826) (2017).

4. Jacobs argues that his trial counsel was ineffective for failing to (1) object to the trial court's jury charge on good character, and (2) object to the trial court allegedly commenting on the evidence through its charge on good character. However, as explained in Division 3, supra, the trial court did not err in its jury charge; nor did it improperly comment on the evidence. Accordingly, any objections on these grounds would have been meritless, and trial counsel cannot be said to have been ineffective for failing to raise them. <u>Wesley v. State</u>, 286 Ga. 355 (3) (a) (689 SE2d 280) (2010) (failing to raise a meritless objection does not constitute ineffective assistance of counsel).

<u>Judgment affirmed. All the Justices concur, except Hunstein J., who concurs in Divisions 1 and 2 and in judgment only in Divisions 3 and 4.</u>

Decided March 5, 2018.

Murder. Warren Superior Court. Before Judge Dunaway.

Kristina G. Connell, for appellant.

William P. Doupé, District Attorney, Kevin R. Majeska, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General, for appellee.