FINAL COPY
309 Ga. 660

S20A0780.  REYES v. THE STATE.

BETHEL, Justice.

A Gwinnett County jury found Herminio Nicolas Reyes guilty of malice murder and other offenses in connection with the stabbing death of Sadot Ozuna-Carmona.[1] Reyes appeals, arguing that the evidence was insufficient to support the jury's verdict on the malice murder count, that the trial court erred by admitting certain evidence pursuant to the "residual" exception to the hearsay rule, and that his trial counsel provided ineffective assistance in several

---

[1] The crimes occurred on August 1, 2004. Reyes was indicted by a Gwinnett County grand jury on April 11, 2018, for malice murder, felony murder, and aggravated assault. At a jury trial held from October 8 to 11, 2018, Reyes was found guilty on all counts. On October 16, 2018, the trial court sentenced Reyes to a term of life imprisonment for malice murder. The felony murder count was vacated by operation of law, and the aggravated assault count merged with the malice murder conviction for sentencing. Reyes filed a motion for new trial through trial counsel on October 19, 2018, which he subsequently amended twice through new counsel. The trial court held a hearing on the motion, as amended, on June 6, 2019, and it denied the motion on October 11, 2019. Reyes filed a notice of appeal on November 8, 2019. His appeal was docketed to the April 2020 term of this Court and was orally argued on May 20, 2020.

regards.  Finding no error, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In July 2004, Reyes was living in an upstairs two-bedroom apartment in Gwinnett County with his girlfriend, Sadot Ozuna-Carmona. The apartment was leased in both of their names. Several other people lived in the apartment, including members of Ozuna-Carmona's extended family and three of her friends.

On July 31, 2004, a birthday party was held at the apartment for the wife of Ozuna-Carmona's nephew. The party began around 8:00 p.m. Numerous members of Ozuna-Carmona's family attended. During the party, Reyes and Ozuna-Carmona began arguing. Reyes came out of one of the apartment's bedrooms, and Ozuna-Carmona came up behind Reyes and hit him over the head with a beer bottle, which caused the bottle to break and caused Reyes to be upset. After their argument, Reyes went downstairs to talk to another family member and later came back upstairs around 9:00 p.m. He would not talk to anyone at the party, and he was described as acting

"serious." Around 11:00 p.m., Ozuna-Carmona packed up Reyes' belongings, put his suitcases in the living room, and told him to leave. Reyes then grabbed his suitcases and began walking toward the parking lot. He put the suitcases in the trunk of a car that belonged to Ozuna-Carmona and left the apartment complex in that car around midnight. Later that night, he returned to the complex and spoke with a member of Ozuna-Carmona's family in the parking lot.

When Reyes returned to the complex, Ozuna-Carmona was in her bedroom. She later came into the living room, cleaned up some broken glass, and then returned to her room. Later, while dressed in her nightgown, she came back into the living room and told everyone at the party that she was going to bed. She then went back to her room around 1:00 a.m.

Around the same time, Nelson Garcia-Ozuna (Ozuna-Carmona's nephew who also lived at the apartment with his wife and son), went to his bedroom where his wife was already asleep, and went to sleep. At that time, Nelson saw three other family

members in the apartment's living room. At trial, he testified that, after he went to bed, he did not hear any screams or cries for help.

The next morning, Nelson's uncle came to the apartment. Nelson and his uncle went to the grocery store and returned to the apartment around 9:00 a.m. Nelson had not seen Ozuna-Carmona that morning. Nelson's son repeatedly knocked on Ozuna-Carmona's locked bedroom door, but he did not receive an answer. Nelson became concerned. Nelson and another family member were eventually able to pry the door open, and once inside the bedroom, they found Ozuna-Carmona lying on the bed covered in blankets. She appeared to be dead.

The police were called, and officers and an investigator from the medical examiner's office responded to the apartment. Ozuna-Carmona was found lying face-up in the bed with her hands resting at her shoulders. Her feet were resting on the wall beside the bed (the side of which sat flush against that wall), and it appeared to the crime scene investigators as though her feet and legs had been lifted off the floor. Ozuna-Carmona was wearing only a tanktop and had

been covered with a blanket from the chest down. A knife was lying next to her on the bed. Ozuna-Carmona's chest, arms, and head were covered in blood, and she was cool to the touch. She had suffered stab wounds to the base of her neck, the left side of her chest, and her upper lip. Various items of her clothing, some of which had suspected blood on them, were located in the bedroom. The blanket and one of the pillows on the bed appeared to have defects caused by the knife. An examination of the bedroom revealed the possible presence of blood and body tissue in several locations on the walls. There was no suspected blood found anywhere else in the apartment. Jewelry and money appeared to be missing from the bedroom. Ozuna-Carmona's car, to which Reyes had a key, was gone and was never seen again after that night.

Ozuna-Carmona's cause of death was later determined to be stab wounds to the neck and chest, consistent with having been inflicted by a knife. The manner of her death was homicide.

When police arrived at the apartment, everyone who was there had been at the party the night before. After members of Ozuna-

Carmona's family were interviewed, police obtained an arrest warrant for Reyes. Attempts to locate Reyes were unsuccessful for over a decade. No member of Ozuna-Carmona's family saw Reyes again until his trial.

During an autopsy of Ozuna-Carmona conducted the day after her body was discovered, the medical examiner collected a bloodstain card as well as rectal and vaginal swabbings. The GBI later collected blood samples from the knife that had been used to stab Ozuna-Carmona. The bloodstain card and swabbings were submitted to the GBI for analysis. In December 2006, a male DNA profile was obtained from the vaginal swab. A mixture of Ozuna-Carmona's DNA and the same male's DNA was also obtained from the rectal swab. The male profile was placed into the computer database for the national Combined DNA Index System (CODIS). In July 2016, that profile was found to match a DNA profile for Reyes that had been uploaded into CODIS.

Based on the "hit" in CODIS, Reyes was located in California. A Gwinnett County detective and an investigator from the district

attorney's office obtained a search warrant to take a sample of Reyes' DNA. They traveled to California and obtained a reference sample of his DNA. The male profile DNA deduced from the vaginal and rectal swabs taken at Ozuna-Carmona's autopsy was found to match Reyes' DNA. Swabbings from the handle of the knife used to stab Ozuna-Carmona also contained Reyes' DNA.

At trial, Nelson testified that Reyes and Ozuna-Carmona had argued on occasions prior to Ozuna-Carmona's death. Their fighting was both verbal and physical, and when they fought, Reyes would often leave but come back the next day. Ozuna-Carmona told Nelson three times that Reyes had threatened to kill her, the last of which was about a week before her death. Another time, Nelson heard Reyes threaten to kill Ozuna-Carmona. Nelson had also told Ozuna-Carmona that she needed to leave Reyes because of their fights. About a month before she was killed, Ozuna-Carmona bought a knife at a yard sale. That same knife was found beside her body. According to Nelson, Reyes was aware that Ozuna-Carmona kept the knife under her bed. Only Ozuna-Carmona and Reyes had keys

to the bedroom door.

The jury also heard testimony from Angelica Martinez. She met Reyes at the end of 2004 in Mexico, and the two married in 2005. They moved to California in 2006. Martinez testified about two incidents in which Reyes had been physically violent toward her. In the first incident, Reyes threw Martinez to the ground and kicked her after she tried to stop him from leaving their apartment. In the second incident, Martinez told Reyes that she wanted a divorce. She then left the room and went to the bathroom. Reyes followed her inside, grabbed her by the hair and neck, and tried to hit her head against the toilet tank.

Reyes argues that the evidence was insufficient to support the jury's guilty verdict on the malice murder charge because the evidence presented by the State was entirely circumstantial and because the State failed to exclude every other possibility besides his guilt. We disagree.

When evaluating the sufficiency of evidence as a matter of federal due process under the Fourteenth Amendment to the United

States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

Further, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Whether alternative hypotheses are reasonable, however, is usually a question for the jury, as this Court will not disturb the jury's finding unless it is insufficient as a matter of law. See *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019).

Here, the evidence showed that Reyes and Ozuna-Carmona engaged in an argument on the evening of July 31, 2004, as they had

done on previous occasions. Testimony established that some of their prior confrontations had been physical and that Reyes had threatened to kill Ozuna-Carmona. In their prior confrontations, Reyes had left the apartment but eventually returned.

The evidence also showed that Reyes had a key to Ozuna-Carmona's bedroom and knew that she kept a knife under her bed. Reyes also had a key to her car, which he drove the night of Ozuna-Carmona's death and which was never seen again after Ozuna-Carmona's body was discovered by her family. Reyes was never seen by any members of Ozuna-Carmona's family again until his trial, and the evidence established that he fled to Mexico before eventually settling in California. His DNA was discovered on the murder weapon and in DNA samples taken from Ozuna-Carmona's body during her autopsy. The testimony of Reyes' wife indicated that he had also been violent toward her.

At trial, Reyes put forward the theory that his DNA was left on the knife and in Ozuna-Carmona's body other than in connection with her death.  Specifically, Reyes argued that both were the result

of Reyes' sexual relationship with Ozuna-Carmona leading up to her death and the fact that the knife had been kept in the bedroom they shared. However, the evidence presented at trial, though circumstantial, established each element of the offense of malice murder and authorized the jury to reject this theory. The evidence also authorized the jury to reject the theory Reyes asserts on appeal that Ozuna-Carmona was killed outside her apartment with her own knife and then carried back to the apartment where the perpetrator staged her room to appear that she had been killed there. Accordingly, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to support Reyes' conviction for malice murder as a matter of due process and under OCGA § 24-14-6. See *Frazier v. State*, 308 Ga. 450, 454 (2) (b) (841 SE2d 692) (2020). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Reyes argues that the trial court erred by admitting statements made to Nelson by Ozuna-Carmona regarding her relationship with Reyes. We disagree.

In the first of the statements at issue, Ozuna-Carmona told Nelson that she had once told Reyes to leave the apartment, that he refused, and that he threatened her. In a second statement, Ozuna-Carmona told Nelson that Reyes had threatened to kill her on multiple occasions and that she and Reyes had fought with each other. In the third statement, Ozuna-Carmona told Nelson that she had a knife and that she believed Reyes knew where she kept it. Ozuna-Carmona made this series of statements to Nelson in the two months before her death. Following a hearing, the trial court admitted each of these statements, over Reyes' objections, pursuant to the "residual" hearsay exception set forth in OCGA § 24-8-807, which states in relevant part:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
> (1) The statement is offered as evidence of a

material fact;

(2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

. . .

The State offered the statements at issue to show the history of abuse and difficulties between Reyes and Ozuna-Carmona and to show that Reyes was aware that Ozuna-Carmona had a knife and that she kept it in the bedroom they shared. Reyes does not argue that the statements were not offered as evidence of a material fact or that the State, through reasonable efforts, could have procured more probative evidence on these points. Moreover, Reyes has not argued that another exception to the hearsay rule applied to the statements at issue. Instead, Reyes argues that the trial court's ruling to admit the evidence constituted an abuse of discretion because, even though Reyes' trial took place after January 1, 2013, the court applied case law interpreting the "necessity" exception to the hearsay rule in Georgia's former Evidence Code. Reyes also

attacks the trial court's determination that the statements at issue had "equivalent circumstantial guaranties of trustworthiness" sufficient to admit them. We consider these arguments in turn.

(a) In ruling upon Reyes' claim in his motion for new trial that the statements at issue here should not have been admitted pursuant to OCGA § 24-8-807, the trial court referred to this Court's decision in *Williams v. State*, 299 Ga. 209, 212 (2) n.2 (787 SE2d 187) (2016), which applied the "necessity" exception to the hearsay rule set forth in former OCGA § 24-3-1 (b). That exception was not carried over into the current Evidence Code. While eliminating the "necessity" exception, the General Assembly modeled the current version of OCGA § 24-8-807, which took effect on January 1, 2013, and applies to all trials conducted after that date, including the trial in this case, on Rule 807 of the Federal Rules of Evidence. See *State v. Holmes*, 304 Ga. 524, 529 (2) (a) (820 SE2d 26) (2018).

As we have noted many times since the enactment of the current Evidence Code, when Georgia courts consider the meaning of provisions of the Evidence Code that were borrowed from the

Federal Rules of Evidence, they are guided by the "decisions of the federal appeals courts construing and applying the Federal Rules, especially the decisions of the Eleventh Circuit." (Citation and punctuation omitted.) *Jacobs v. State*, 303 Ga. 245, 249 (2) (811 SE2d 372) (2018). Cases decided under the "necessity" exception to the hearsay rule in Georgia's former Evidence Code are thus not applicable to the interpretation of OCGA § 24-8-807 and should not be relied on by trial courts in determining whether to admit evidence. *Holmes*, 304 Ga. at 530 (2) (a).

However, despite its citation to *Williams*, the trial court's order denying Reyes' motion for new trial on this ground relied primarily on *Jacobs*, a decision of this Court setting forth the appropriate factors for the trial court to consider in determining whether to admit evidence under OCGA § 24-8-807.[2] Because the trial court

---

[2] The transcripts of the hearings as to whether the statements at issue should be admitted pursuant to OCGA § 24-8-807 indicate that the trial court was aware that *Williams* construed the former Evidence Code but that the trial court thought *Williams* gave some guidance to the court as to the factors it could consider in determining trustworthiness. Later in the hearing, however, the trial court indicated to the parties its belief that "*Jacobs* is the best case"

ultimately applied the appropriate evidentiary standard despite its citation to a case construing the former Evidence Code, it is unnecessary for us to vacate the trial court's denial of Reyes' motion for new trial on this ground. Compare *Holmes*, 304 Ga. at 530 (2) (a) (where trial court does not apply the proper evidentiary standard in analyzing admissibility of evidence under OCGA § 24-8-807, remedy is to vacate order, remand the case, and direct the trial court to apply the correct standard).

(b) We now consider whether the trial court abused its discretion by admitting the statements at issue pursuant to the residual exception. *Tyner v. State*, 305 Ga. 326, 330 (2) (825 SE2d 129) (2019) (admission of evidence pursuant to OCGA § 24-8-807 reviewed for abuse of discretion). This exception applies

> only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present. Such guarantees must be equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, and statements of personal or family history. These categories of hearsay have attributes of

it had to work with. The trial court later referred to the *Jacobs* case regarding the trustworthiness of statements made in regard to domestic violence.

trustworthiness not possessed by the general run of hearsay statements that tip the balance in favor of introducing the information if the declarant is unavailable to testify. And they are all considered sufficiently trustworthy not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made.

(Citations and punctuation omitted.) *Jacobs*, 303 Ga. at 249 (2). "[B]ecause the residual exception applies only to statements not specifically covered by any law, trial courts should consider whether a specific exception to the hearsay rule applies before applying [OCGA § 24-8-807]." (Citation, punctuation and emphasis omitted.) *State v. Hamilton*, 308 Ga. 116, 124 (3) (b) n. 10 (839 SE2d 560) (2020). A trial court should consider the totality of the circumstances in determining whether to admit evidence pursuant to OCGA § 24-8-807. *Tanner v. State*, 301 Ga. 852, 856-857 (1) (804 SE2d 377) (2017).

Here, the trial court determined that there were a number of factors that weighed in favor of finding that the statements made by Ozuna-Carmona to Nelson were trustworthy. It noted that the statements concerned violence and abuse, that Ozuna-Carmona had

no motive to fabricate any of the statements, and that she had made them to Nelson shortly before her death. The trial court also took particular note of the fact that Nelson and Ozuna-Carmona were close relatives and that they had been residing in the same apartment for several months when the statements were made. The trial court based this determination on Nelson's proffered testimony, in which he indicated that he and Ozuna-Carmona had a close relationship in which they regularly shared with each other what was happening in their lives. Additionally, Nelson had actually witnessed fights and arguments between Ozuna-Carmona and Reyes (including the argument between them the night Ozuna-Carmona was killed) and had heard Reyes threaten Ozuna-Carmona on one occasion. Because each of these factors support a determination that there were exceptional guaranties of trustworthiness regarding the making of these statements, we see no abuse of the trial court's discretion in permitting Nelson to testify to Ozuna-Carmona's statements to him. See *Tyner*, 305 Ga. at 330 (2) (no abuse of discretion where statement was made in the context

of close family relationship and where declarant had no motive to lie); *Jacobs*, 303 Ga. at 250-251 (2) (no abuse of discretion where statements made to close friends concerned history of threats and violence between domestic partners). See also *Holmes*, 304 Ga. at 529 (2) (a) ("This Court is particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." (citation and punctuation omitted)). This enumeration of error therefore fails.

3. Reyes also argues that his trial counsel provided ineffective assistance by failing to move to suppress the DNA sample collected from Reyes in California pursuant to a search warrant and by failing to present exculpatory and impeachment evidence from the interview that Nelson gave to police the day after Ozuna-Carmona was killed. To prevail on these claims, Reyes

> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance,

[Reyes] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Reyes] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Citation and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). "A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation and punctuation omitted.) *Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d 906) (2016). We consider the two claims of ineffective assistance in turn.

(a) Reyes first argues that his trial counsel performed deficiently by failing to file a motion to suppress the DNA evidence collected from Reyes. We disagree.

After learning in 2016 that Reyes was incarcerated in California, Gwinnett County police obtained a search warrant in Santa Clara County, California in order to take a DNA sample from

him that could be matched against DNA taken from the crime scene. The warrant was issued by a judge in that county to a Gwinnett County police officer who then obtained the DNA sample from Reyes. The officer then returned the DNA sample to the Georgia Bureau of Investigation. The GBI later determined that DNA evidence taken from the crime scene (which included semen found inside Ozuna-Carmona's body and skin cells on the knife that had been used to stab her) matched the sample taken from Reyes. Reyes was later extradited to Georgia.

Reyes argues that his trial counsel should have moved to suppress this DNA sample collected from him in California and that a motion to suppress would have been successful because the process by which it was obtained violated several provisions of California law relative to the issuance, execution, and return of search warrants. However, even assuming that Reyes would have been successful in suppressing the DNA sample obtained from him in California, he has still failed to show that his counsel performed deficiently by failing to move to suppress that evidence. That is

because he has failed to show that no reasonable attorney would have decided, as a matter of trial strategy, to forgo moving to suppress the DNA evidence under the circumstances of this case.

Here, Reyes' counsel, who previously served as a prosecutor for 25 years, testified at the hearing on Reyes' motion for new trial that, based on his experience, even if he had successfully suppressed the results of the California search, the State would simply have obtained a new search warrant for Reyes, obtained a new DNA sample from him, and matched it to the DNA found at the crime scene. Counsel also determined that, even though the evidence showed that Reyes' DNA matched the DNA found at the crime scene, counsel could actually use that fact to attack the State's case by showing that the DNA evidence did not actually prove that Reyes killed Ozuna-Carmona and that there were other reasonable explanations for its presence. Counsel thus elected not to move to suppress the DNA sample taken from Reyes but to instead pursue a defense strategy that embraced the DNA evidence while challenging the State's theory as to why Reyes' DNA was at the crime scene.

Specifically, counsel argued to the jury that because Reyes and Ozuna-Carmona shared the bedroom in which Ozuna-Carmona kept the knife and because they had been in an ongoing sexual relationship, the presence of Reyes' DNA at the crime scene could be explained other than by the theory that he killed Ozuna-Carmona. Reyes' counsel also elicited testimony from the State's DNA expert to show that, in light of his relationship to Ozuna-Carmona and his residence in the apartment, the mere presence of Reyes' DNA at the crime scene did not prove that he committed the crimes. Counsel testified at the hearing on the motion for new trial that he believed his explanation for the DNA evidence would undermine the State's claims as to why the DNA was found at the crime scene and that, in light of the State's burden of proof, this would be sufficient to acquit Reyes. He further testified that it was his experience that the jury would find this explanation to be plausible.

In light of the foregoing, we cannot say that the strategy pursued by Reyes' trial counsel was unreasonable. Counsel could reasonably determine that a motion to suppress would not

ultimately have succeeded in excluding evidence that Reyes' DNA matched the DNA samples taken from the crime scene, as it seems likely that, as counsel suggested, the State would have simply sought and executed a new warrant for the collection of a new DNA sample from Reyes had the first sample been suppressed. Reyes has thus failed to "make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." (Citation and punctuation omitted.) *Mosley v. State*, 307 Ga. 711, 720-721 (4) (a) (838 SE2d 289) (2020).

Moreover, "[t]rial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *McNair v. State*, 296 Ga. 181, 184 (2) (b) (766 SE2d 45) (2014). Here, even assuming that trial counsel might have ultimately been successful in suppressing the DNA sample taken from Reyes in California, as a matter of trial strategy, it was not patently unreasonable for trial counsel to determine that the best

defense strategy in this case was for Reyes to forgo a motion to suppress, welcome the admission of the DNA evidence, offer a plausible explanation for the presence of Reyes' DNA at the crime scene, and refute claims made by the State as to how that evidence tied Reyes to Ozuna-Carmona's death. See *Gomez v. State*, 301 Ga. 445, 459 (6) (a) (801 SE2d 847) (2017) (no deficient performance where counsel could reasonably determine that best strategy was to forgo objection to certain testimony and instead use it to challenge the State's theory of the case); *Aikens v. State*, 297 Ga. 229, 233 (3) (773 SE2d 229) (2015) (no deficient performance where trial counsel failed to object to certain testimony that was ultimately beneficial to defendant because it showed that he had no motive to commit the charged offenses). This claim of ineffective assistance therefore fails.

(b) Reyes also argues that his trial counsel performed deficiently by not using statements given by Nelson to police investigators the day after Ozuna-Carmona's death to impeach his proffered testimony in regard to the admission of Ozuna-Carmona's statements under OCGA § 24-4-807 and to attack his trial

testimony. We disagree.

As noted above, during Reyes' trial, the trial court held a hearing as to whether it should admit, pursuant to OCGA § 24-8-807, certain statements that Ozuna-Carmona made to Nelson regarding her relationship with Reyes. After Nelson described to the trial court what Ozuna-Carmona had told him and what he had witnessed, he was cross-examined by Reyes' trial counsel. During that cross-examination, Nelson testified that he had given a statement to police the day after Ozuna-Carmona's death in 2004. Nelson testified that he told the police that Ozuna-Carmona and Reyes would argue but that he did not tell the police that Reyes had threatened Ozuna-Carmona. The State provided the trial court with an audio recording of the 2004 interview, which the court listened to after the hearing adjourned. The following morning, the trial court indicated to the parties that little of the recording was "intelligible" and that it could not hear that Nelson had been asked "those questions." Reyes' trial counsel later argued to the trial court that Ozuna-Carmona's alleged statements to Nelson should be excluded

because Nelson said nothing to the police in 2004 about any history of threats and violence between Ozuna-Carmona and Reyes other than the argument they had the night of Ozuna-Carmona's death. The trial court ultimately ruled that the statements were admissible pursuant to OCGA § 24-8-807.

Nelson was called by the State to testify at trial. In that testimony, he stated that Reyes and Ozuna-Carmona had argued on occasions prior to Ozuna-Carmona's death. He also testified that their fighting was both verbal and physical and that, often when they fought, Reyes would leave but come back the next day. Nelson testified that Ozuna-Carmona told him three times that Reyes had threatened to kill her, the last of which was about a week before her death. On another occasion, Nelson heard Reyes threaten to kill Ozuna-Carmona.

Reyes' trial counsel cross-examined Nelson about inconsistencies in his testimony, including inconsistencies between what he testified to on direct examination at trial and the statements he had made in the proffer the day before outside the

jury's presence. In that line of questioning, trial counsel highlighted that Nelson had testified both that he had and had not seen Ozuna-Carmona hit Reyes with a beer bottle the night she was killed. Nelson then testified that he could not remember which of those statements was true. Nelson then testified that he told the police in his 2004 interview that Reyes had threatened Ozuna-Carmona. Nelson then admitted in the presence of the jury that he had testified in a hearing the day before that he had never told the police about threats Reyes made against Ozuna-Carmona.

At the hearing on Reyes' motion for new trial, Reyes' appellate counsel brought forward a Spanish-to-English translation of Nelson's 2004 police interview that was prepared by an interpreter after appellate counsel began representing Reyes.[3] According to the translation offered by appellate counsel, a transcript of which was placed in the record of the hearing on the motion for new trial, Nelson stated in the 2004 police interview that he did not know why

---

[3] The interpreter testified that it took her "well over 30 hours" to complete the translation because four voices on the recording spoke over one another, making it "very difficult to make out what was being said."

Ozuna-Carmona had problems with Reyes, that he did not know how Reyes and Ozuna-Carmona "lived their private lives," that neither he nor his wife had talked to Ozuna-Carmona about why she and Reyes had problems or about "what happened," and that Ozuna-Carmona did not "confide" in anyone.

The record shows that an audio recording of the interview included the words of an officer who spoke both English and Spanish and translated questions and responses between Nelson and the English-speaking officers who conducted the interview. Trial counsel testified that, prior to trial, he had an interpreter review the interpretations offered by the bilingual officer that could be heard on the recording. Trial counsel testified that, based on his memory of the interview, there was nothing exculpatory contained in the interview and that his interpreter had not reported any "glaring inconsistencies" in the translation that could be heard on the recording and that he had received only "minor" notes from the interpreter about the accuracy of the officer's translations. Trial counsel further testified that, in his view, he "impeached the dog out

of Nelson" at trial, including by having him admit in front of the jury that his testimony the day before in a hearing outside the jury's presence was inconsistent with what he had just said from the witness stand. He further testified that he did not believe anything in the interview would have helped in excluding Ozuna-Carmona's statements to Nelson under OCGA § 24-8-807.

Reyes argues that, had his trial counsel introduced the translated statements from the interview at the hearings in which Ozuna-Carmona's statements to Nelson were admitted pursuant to OCGA § 24-8-807, the trial court would have been unlikely to determine that the statements at issue were trustworthy. Reyes also argues that trial counsel performed deficiently by not using the translations of the interview to impeach Nelson's testimony at trial. We disagree with both contentions.

The record makes clear that the audio recording of the interview was reviewed by the trial court before it ruled on the admissibility of Ozuna-Carmona's alleged statements to Nelson under OCGA § 24-8-807. Because trial counsel was not aware of any

"glaring inconsistencies" between the translations offered by the bilingual officer on the recording and those of the interpreter he engaged to review the recordings, it was not unreasonable for trial counsel to forgo seeking further translations of the interview. Moreover, the record also makes clear that trial counsel argued that the contents of the interview should be considered by the trial court in determining whether the statements at issue should be admitted pursuant to OCGA § 24-8-807. Thus, Reyes has made no showing that his trial counsel failed to present Nelson's statements in the interview to the trial court.

Moreover, we are not persuaded that further highlighting of Nelson's statements in the interview by trial counsel would have had any effect on the trial court's ruling under the residual exception. To the extent any of Nelson's statements on the recording now highlighted by Reyes conflict with testimony he proffered to the trial court in the hearing, those conflicts go only to Nelson's credibility. But as we discussed in *Jacobs*, the trial court must make its determination of the trustworthiness of the hearsay statements at

issue "not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made." (Citations and punctuation omitted.) 303 Ga. at 249 (2). The record is clear that this was the trial court's focus in reaching its ruling with regard to the admission of the statements. And because Nelson's credibility was not the main factor to be considered by the trial court in evaluating the trustworthiness of the statements Ozuna-Carmona allegedly made to Nelson, Reyes cannot show that no reasonable attorney would have proceeded as his trial counsel did in this case as to this issue.

Reyes has also failed to show that his trial counsel performed deficiently with regard to impeaching Nelson's trial testimony. As trial counsel noted in the hearing on the motion for new trial — and as the trial record makes clear — trial counsel vigorously cross-examined Nelson about what he told the police in 2004, even going so far as to secure an admission from Nelson that he had given different testimony on this subject the day before while under oath in a hearing outside the jury's presence. In light of these efforts by

trial counsel, we cannot say that his use of the 2004 interview constituted deficient performance. This claim of ineffective assistance therefore fails.

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 10, 2020 – RECONSIDERATION DENIED SEPTEMBER 8, 2020.

Murder. Gwinnett Superior Court. Before Judge Davis.

*Frances C. Kuo*, for appellant.

*Daniel J. Porter, District Attorney, Samuel R. d'Entremont, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.