312 Ga. 771
FINAL COPY

S21A0771.  ASH v. THE STATE.

BETHEL, Justice.

A Fulton County jury found Jabarri Ash guilty of malice murder and other crimes arising from the shooting death of Mario Shaw. On appeal, Ash argues that the trial court erred by admitting evidence of his prior convictions pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)"); that the trial court erred by admitting, pursuant to OCGA § 24-8-807, evidence of certain statements made by Shaw; that the State improperly destroyed exculpatory evidence; that the trial court plainly erred in its instructions to the jury; and that the cumulative harm of these errors affected the trial's outcome such that he should receive a new trial. For the reasons set forth below, we affirm.[1]

---

[1] The crimes occurred on February 21, 2013. On June 28, 2013, a Fulton County grand jury returned an indictment against Ash charging him with malice murder (Count 1), felony murder (Counts 2 and 3), aggravated assault with a deadly weapon (Count 4), possession of a firearm by a convicted felon

1. The evidence presented at trial showed the following.[2] Ash, Shaw, Brian Terrell, David Minor, and Jonathan Ash (Ash's brother) were friends who grew up together in Atlanta. Beginning in high school, they were in the business of selling cocaine and marijuana.

Ash was known to carry a .44- or a .38-caliber revolver. Terrell testified that Ash was known by the nicknames "Big" and "Big Boy" because "he was the biggest person around." Jonathan drove a white SUV that Ash also drove from time to time.

In December 2012, Jonathan was driving his SUV with Shaw

(Count 5), and possession of a firearm during the commission of a felony (Count 6). A jury trial held from August 25 to September 2, 2015, ended in a mistrial. Ash was later re-tried from March 15 to March 25, 2016, and the jury found him guilty of all counts. On March 30, 2016, the trial court sentenced Ash to life in prison on Count 1 and terms of five years in prison each on Counts 5 and 6, to be served concurrently with Count 1. The remaining counts were merged for sentencing or vacated by operation of law. On April 4, 2016, Ash filed a motion for new trial, which he amended through new counsel on June 21, 2019, and February 17, 2020. The trial court held two hearings on the motion, as amended, and denied the motion on December 7, 2020. Ash filed a notice of appeal on December 28, 2020. This case was docketed in this Court to the term commencing in April 2021, and oral argument was held on June 8, 2021.

[2] Because, as discussed below, we must determine whether an assumed error on the part of the trial court was harmless, "we review the evidence de novo and weigh it as a reasonable juror would, rather than reviewing it in a light most favorable to upholding the jury's verdicts of guilty." *Taylor v. State*, 306 Ga. 277, 283 (2) (830 SE2d 90) (2019).

in the passenger seat when they were stopped by the police at a DUI checkpoint. After smelling unburnt marijuana and seeing marijuana and an open container of alcohol on the rear floorboard of the SUV, the police arrested Jonathan and Shaw and searched them. The police found marijuana and $1,004 in cash on Shaw's person. Jonathan had over $10,000 in cash, but he had no drugs on his person. Because the marijuana appeared to be packaged for distribution, the police charged both men with possession of marijuana with intent to distribute and impounded the SUV.[3]

Jonathan was again arrested in January 2013 for aggravated battery and armed robbery. At the time of the arrest, Jonathan had more than $75,000 in cash in a shoebox in his vehicle, a red sedan.

The group used Jonathan's house to store drugs. Shaw told Terrell that he was at the house when he heard that the police had arrested Jonathan. Apparently anticipating a search, Shaw retrieved what he thought were all of the illegal drugs in the house

---

[3] A police officer testified that no "hold" was placed on the vehicle after it was impounded.

and took them to his mother's house. The police later searched Jonathan's house. During the search, the police found 16 ounces of cocaine, 13 ounces of marijuana, two jars containing marijuana residue, and 29 Ecstasy pills in the house. At some point following the search of Jonathan's house, Shaw returned the drugs, but Ash accused him of not returning all of the drugs he had taken.

Terrell talked with Shaw about being arrested with Jonathan, and Terrell was among those (including Ash) who thought that Shaw should "take the charge" and exonerate Jonathan. In their conversation, Shaw said that he knew Ash blamed him for Jonathan's arrests and that Ash believed the drugs in Jonathan's SUV and house actually belonged to Shaw. According to Terrell, Ash and Shaw had a "heated" conversation about the drugs. Ash was "upset" with Shaw for not taking the blame for the drugs. Even after Shaw took the drugs from the house before the police search, Shaw told Terrell that he thought Ash was still "upset" with him. Despite his anger with Shaw, Ash continued to provide Shaw with drugs to sell.

4

In early February 2013, Letavia Gowdy and her mother, Denise Gowdy, moved into Shaw's apartment. Shaw sold marijuana at the apartment, and he told Letavia and Denise to lock all the doors when they left the apartment. Denise testified that people were regularly coming to the apartment to buy drugs when Shaw was there.

Denise testified that, during the first week she was staying in the apartment, Ash, whom she only knew as "Big Boy" at the time, visited Shaw three times.[4] On the first visit, Ash and Shaw had a "tense" and "hostile" argument regarding an incident between Shaw and Ash's brother. On the second visit, Shaw did not allow Ash into the apartment. On the third visit, Denise told Ash that Shaw was

---

[4] During an interview with the police, Denise viewed a six-person photographic lineup prepared by the police. Denise identified one of the photographs as a person she said looked like "Big Boy." The detective who conducted the photo lineup testified that Denise identified Ash in the lineup, and the lineup with Denise's identification of "Big Boy" was admitted into evidence at trial. Denise was also able to show the police where Ash lived. His apartment was roughly a ten-minute drive from Shaw's apartment, which Denise knew because she had gone there with Shaw. Denise told the police and testified at trial that "Big Boy" wore glasses and was "overweight" with a "caramel" complexion. At trial, Denise identified Ash as "Big Boy" by pointing him out in the courtroom.

not there. On that visit, Denise saw a white SUV parked outside. Denise described Shaw as "paranoid and annoyed" after Ash's visits, and she testified that she knew there were "issues" and "concerns" between them. Letavia also noticed that Shaw's demeanor changed during this time. When she first met Shaw in early February, he was "very nice," but Letavia testified that he smiled less and seemed to spend more time "in deep thought" by the middle of the month.

Letavia and Denise last saw Shaw alive around 7:00 or 8:00 p.m. on February 20, 2013, when Denise took Letavia to work. When Letavia returned to the apartment around 3:30 a.m. on February 21, she saw that the doors to the apartment were unlocked. She went inside and saw Shaw lying on the floor with blood pooled around his head. She also saw marijuana in the apartment. She did not see anything out of place, and the apartment did not appear to have been ransacked or robbed. She went outside, arranged a ride to the house of a friend, and called 911 just before 4:00 a.m. Her friend took her back to Shaw's apartment, and they arrived as firefighters were pulling into the complex. Denise also returned to the apartment

6

around 4:00 a.m.

Several police officers responded to the 911 call. Inside the apartment, Shaw was dead, lying face down with his hands under his body. The medical examiner determined that Shaw was shot twice, once in the back of his head and once in his left lower torso. The medical examiner recovered two bullets from Shaw's body, and a GBI firearms examiner determined that the same firearm fired both bullets from what was either a Ruger, Colt, or High Standard .38 Special revolver or a .357 Magnum revolver. The medical examiner concluded that Shaw's death was caused by the gunshots to his head and torso and that the manner of death was homicide.

Prior to Shaw's shooting, Roger Cook, the apartment complex's security guard, often saw a man he knew as "Big Boy" visiting Shaw and driving a white SUV. In the weeks leading up to the shooting, Cook noticed that Shaw became "stressed" and "worried," acted "strangely," and began walking around with a handgun.

The night of Shaw's shooting, Cook was watching television and playing videogames in his townhome, which was across the

parking lot from Shaw's apartment. Cook responded to a noise complaint and told a person in a white SUV parked in front of Shaw's apartment to lower the music.[5] Cook then began a foot patrol around the apartment complex and, moments later, saw "Big Boy" in the white SUV as it drove quickly past him.[6] As he continued his

---

[5] Cook spoke with the lead detective at the crime scene and at a later interview at the police station. Cook first stated that he spoke to the driver of the SUV when responding to the noise complaint around 1:00 a.m. but later said that it was between 2:30 and 3:00 a.m. Cook also said that the person he spoke to had glasses, a beard, and a "dark complexion." Cook initially told the detective that he saw this man regularly but later said that he had never seen that person before and that he "[couldn't] remember" and "[didn't] know" the name or nickname of the man he spoke to. Cook also told the police that, while doing his rounds after speaking to the person in the SUV, he saw a man sitting in the driver's seat of the SUV looking up at the apartment and then another man with a "light complexion" and "matching the description of Big Boy," whom Cook "had seen before," coming down the stairs of the apartment building and getting into the passenger side of the SUV. Cook said that he had previously seen this man coming to the apartment complex in a red Dodge Charger. The detective who interviewed Cook testified that when he interviewed Cook at the police station, some of his statements were consistent with what Cook had said at the scene, but some of them were not. The detective described Cook's competing statements as "confusing." During his cross-examination, Cook stated that the person he spoke to in the SUV was "Big Boy." Cook described "Big Boy" as "broad, wearing black glasses with rectangular shading; beard smooth; smooth, clean cut; . . . curly, wavy hair." The lead detective testified that this description Cook gave of "Big Boy" was consistent with Ash's appearance.

[6] In its briefing, the State claims that Cook specifically identified Ash as the man in the SUV, but a careful review of the record shows that Cook never specifically identified Ash as "Big Boy" or as the man he saw in the white SUV the night of Shaw's shooting. In addition, it appears that when shown a photo

8

patrol, Cook saw that the front doors to Shaw's apartment were wide open and the lights inside the apartment were on. Cook saw Shaw's body on the floor and attempted to call the police.[7] Cook later realized that a sound he had heard earlier while he was playing videogames was likely a gunshot.[8]

According to Nichole Stevens, Ash's girlfriend at the time, Ash was at her apartment in Riverdale on the evening Shaw was shot.

lineup with Ash's picture in it, Cook said the man he saw on the night of Shaw's shooting looked more like someone else in the lineup. Cook was not asked by the prosecutor or defense counsel whether "Big Boy" was present in the courtroom when he testified. During his direct examination, however, Cook testified that as the white SUV drove past him, he was standing on the driver's side of the vehicle and that the area was well-lit. Cook testified that he was "absolutely sure" that "Big Boy" was driving the SUV as it sped away.

[7] Cook testified that he had poor cell phone reception and that the call would not connect. He testified that he later realized that someone else had called 911 when paramedics and police responded to the scene. These statements appear to be contradicted by statements Cook made to the lead detective when he was interviewed at the scene; in those statements, Cook mentioned nothing about going up to Shaw's apartment and suggested to the detective that he only learned that there had been a shooting at the complex when his brother knocked on his front door around 4:00 a.m.

[8] During his testimony, Cook admitted that he had previously pled guilty to impersonating a law enforcement officer in Chicago, Illinois. He explained that in the 1990s, he worked with local police and bail bondsmen as a bounty hunter and indicated that he had been arrested because "different states recognize it, some states don't" and that "Chicago didn't allow bounty hunters or bail bondsmen." Cook also admitted that he pled guilty in 2005 to a separate charge of impersonating an officer with the Fulton County Sheriff's Office when he identified himself as "Officer Cook" while working as a security officer.

Stevens testified that they had a trip to Florida planned for the following morning and that they had been packing and preparing for it that day. At some point in the evening, Ash left the apartment and "went on about his evening."

Between 9:00 and 10:00 that night, Terrell was at the 50 Yard Line bar, which was about a ten-minute drive from Shaw's apartment at that time of night. Terrell was selling marijuana and cocaine to several men he had met earlier in the week. They stayed at the bar for "three or four" hours and then left to play pool at the Brazilian Club near Camp Creek Parkway. Terrell returned to the hotel where he was staying around 3:00 a.m.

Ash called Terrell just before 3:00 a.m. and told him to come back to the 50 Yard Line bar. Terrell met him there around 3:30, and the two stayed there until about 4:00 a.m. Just after 4:00 a.m., Ash sent Stevens a text message saying that Shaw had been "found dead." After Ash and Terrell left the 50 Yard Line, they went to the Brazilian Club. They stayed until about 5:30 a.m. During their time together, Ash did not mention anything about Shaw to Terrell.

10

Terrell said that Ash was driving a black sedan that belonged to Stevens.

About 20 minutes after they left the Brazilian Club, Ash called Terrell and asked if he could leave for Florida that day. According to Terrell, this surprised him because he thought the trip was planned for the following day.[9] Terrell testified that one of the purposes of the trip was to retrieve some cocaine that had been left with Minor (who lived in Jacksonville, Florida) a few days before.

After Ash left the Brazilian Club, he drove to Stevens's apartment and showered and changed clothes. Stevens then washed the clothes Ash had been wearing with her other laundry. In an interview with the police and in her trial testimony, Stevens denied that she destroyed the clothes Ash had been wearing when he came to the apartment.[10]

Ash and Stevens left the house later in the morning and, after

---

[9] Terrell's testimony appeared to contradict earlier statements he had made to the police in which he told Ash at the 50 Yard Line, "we got to be up and go in the morning if we supposed to be going."

[10] The lead detective testified that Stevens was not charged with murder or with tampering with evidence.

picking up Terrell and his girlfriend, began driving to Jacksonville. During the drive, Ash and Terrell began receiving calls about Shaw being killed. According to Stevens, Ash and Terrell both reacted to the news with "shock" and "disbelief." According to Terrell, this was the first time he had heard anything about Shaw's death. After overhearing the conversations, Stevens believed that Shaw's murder stemmed from "quarrels" or "disagreements" involving Ash's brother. The group continued driving to Jacksonville and arrived in the early afternoon.

Ash and Terrell met Minor, and the three drove around town together. Minor testified that, while the three were in the car together, Ash said that he had "finessed" Shaw by making him feel comfortable and letting him into his apartment and that he then killed Shaw by shooting him twice with a .44 or .38 revolver.[11] Minor

---

[11] At trial, Terrell first testified that when he, Ash, and Minor were together in Florida after Shaw's shooting, Ash "didn't say anything at all" about the shooting. Terrell later testified that he overheard a "heated" conversation in which Ash accused Minor of "finessing" some cocaine, meaning that he diluted it by adding another substance to it. In that conversation, Terrell also overheard Ash say something to Minor about "finessing" Shaw.

testified that Ash said he killed Shaw because of money that Shaw owed to Ash and because of "a charge that his brother caught when him and [Shaw] were together." According to Minor, Ash was also angry with Shaw because he had given Shaw some cocaine but Shaw never paid him for it. When Ash confronted Shaw about this at his apartment, the two argued, Shaw refused to pay, and then Ash shot him twice. Minor testified that he was upset when he learned that Shaw had been killed but that Ash told him "You get what you get. What you give out is what you get in return, like karma." Minor took this to mean that Ash was saying Shaw "got what he deserved."

A few days after his conversation with Ash, Minor called the Crime Stoppers anonymous tip line. He later spoke with the lead detective in the case to report that Ash had admitted killing Shaw.[12]

_____

Terrell explained, however, that the conversation was solely about adding substances to cocaine, not Shaw's shooting. Terrell later testified that Ash and Minor were also "clashing" because Minor had slept with Ash's girlfriend, Jasmine, a week or so before Shaw's shooting. In his trial testimony, Minor admitted that he and Jasmine had sex a few days before Shaw was killed and that Ash had confronted him about it. Minor denied that he made up the story about Ash confessing to Shaw's killing because of his relationship with Jasmine and denied that Ash had accused him of diluting drugs.

[12] In his testimony, Minor acknowledged that people who provide tips

Minor told the detective that Ash said he shot Shaw twice with a revolver.[13] Minor told the detective that Ash said he shot Shaw for "payback" for Jonathan being in jail for charges that Shaw should have taken.

Minor also told the detective he had seen Ash driving a white SUV when Ash visited him in Florida a few days before Shaw's shooting. The detective testified that the description Minor gave of the SUV matched the description given by Cook and the Gowdys. Minor also told the detective that Stevens told him that, on the night of Shaw's shooting, she washed the clothes Ash was wearing when he came to her house and "got rid of them, discarded them."

---

that lead to an arrest or conviction may receive compensation and that he asked to be paid for providing the tip, but he denied that he needed money or that he reported the crime to get money. Minor explained that he called Crime Stoppers because he and Shaw were friends. The defense also introduced evidence that Minor pled guilty to grand theft in 2015 in Florida based on an incident in which he stole $1,180 from a gas station.

[13] The detective testified that, other than the Gowdys and Cook, Minor was "one of the first" witnesses he spoke to about the shooting and that he was the first witness to provide any information about the type of gun that might have been used in the shooting. According to the detective, Minor's statement that Ash had used a revolver was consistent with the evidence at the crime scene, where no shell casings had been recovered. The State presented evidence that when a revolver is fired, the shell casings remain in the chamber and are not automatically ejected as they would be when a pistol is fired.

Stevens was later interviewed at the police station. She first told the detective that Ash had been with her "24/7" from February 19 to February 21 and that she last saw him on February 21 in Florida. The detective testified that he knew that the first statement was untrue because he had records of a text message that made it clear that Ash had been away from Stevens's apartment on the night of Shaw's shooting. The detective further testified that when he confronted Stevens with the text message, her demeanor changed and she "changed her story" and said that Ash came to her apartment between 3:30 and 4:00 a.m. the night of the shooting and wanted to wash his clothes. She also told the detective that there was conflict between Shaw and Ash over Jonathan and that the 4:00 a.m. text message from Ash said that "Mario Shaw was found dead."

The detective later confronted Stevens about whether February 21 was actually the last time she saw Ash. Stevens then admitted that, after the trip to Florida, she flew home to Atlanta but

returned to Florida a few days later to retrieve $6,000 and see Ash.[14]

The detective testified that, following his interview of Stevens, Ash became the "prime suspect" for Shaw's murder.[15] Ash later agreed to be interviewed by the lead detective and another officer. On April 5, 2013, after being read the *Miranda* warnings,[16] Ash said that he was with Stevens for all of February 20 and 21. When confronted with evidence that he had been away from Stevens during that time, he admitted that he had gone to the 50 Yard Line bar with Terrell around 7:00 p.m. on February 20 and stayed there with him until about 1:00 a.m. on February 21. He said that he then left to go home to wash his clothes and prepare for a trip to Florida. Ash said that he first heard about Shaw's death around 4:00 a.m. from someone at the 50 Yard Line. He also told the detective he

---

[14] At trial, Stevens testified that she flew back to Atlanta separately from the rest of the group a few days after they arrived in Jacksonville. When Ash returned to Atlanta, he was driving a rental car. According to Stevens, she returned to Florida in March to pick up around $1,900 for Ash. She did not elaborate as to where, why, or from whom she picked up the money.

[15] The detective testified that Ash first became a suspect after the detective's initial interview with Denise.

[16] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

16

returned to Stevens's apartment around 4:00 a.m. When confronted by the detective with the text message he sent to Stevens, Ash told the detective that he was staying at a hotel that night but could not remember the name of the hotel. He then told the detective that he returned to Stevens's apartment around 8:00 a.m. Ash denied ever having a gun, stating that he was a felon and could not possess one. Ash said that he and Shaw were "good friends" who "never had any beef with each other." Ash first denied that he and Shaw sold drugs but later admitted that they were in the drug business.

The detective interviewed Terrell on April 8. He told the detective that Ash sometimes carried a Ruger revolver. The detective also testified that records showing the location of Terrell's phone throughout the evening of February 20 and the morning of February 21 were consistent with Terrell's statements about his whereabouts. After the interviews, the detective obtained an arrest warrant for Ash for Shaw's murder.

At Ash's trial, the State presented evidence of an altercation between Ash and Hulit Colton in May 2008. Colton confronted Ash,

17

whom he had never met, after Ash tried to speak to Colton's girlfriend on the street. Ash was sitting in his car and then "just started shooting" once Colton confronted him. Ash's shots missed Colton and other bystanders but damaged a nearby car. Ash then drove away. The State introduced evidence that Ash pled guilty in June 2009 to two counts of aggravated assault, a felony, arising from this incident.

Ash elected not to testify. He called only one witness, a private investigator who testified that, on a test drive around 3:00 on a recent weekday afternoon, it took him approximately 20 minutes to drive from Shaw's apartment to the 50 Yard Line bar. On cross-examination, the investigator stated that there was more traffic at that time of day than there would be around 1:00 or 2:00 a.m.

2. Ash first argues that the trial court erred by admitting evidence of his 2009 convictions as other acts pursuant to OCGA § 24-4-404 (b). Before trial, the State gave notice of its intention to introduce evidence about the convictions and testimony from Colton about the incident. The State argued that it wanted to introduce this

18

evidence for the purpose of showing Ash's motive and intent with respect to Shaw's murder and the other charges in this case. The State argued that the evidence demonstrated that "when [Ash] has been wronged, he responds with violence." Over Ash's objection, the trial court determined that the evidence could be admitted for the purposes of showing motive and intent.

After Colton testified at trial, the trial court gave a limiting instruction regarding his testimony. Although that charge indicated that some evidence could be used only for limited purposes, the trial court did not specify for what purposes Colton's testimony or evidence of Ash's convictions could be used.[17] In its final charge to the jury before deliberations began, however, the trial court instructed as follows:

> In order to prove its case in the indictment, the State must show intent. To do so, the State has offered evidence of another act allegedly committed by the accused. You are permitted to consider that evidence only insofar as it may relate to those issues and not for any other purpose.

---

[17] In the instruction, the trial court stated that "[s]ometimes evidence is admitted for a limited purpose. Such evidence may be considered by the jury for the sole issue or purpose against that party for which the evidence is limited and not for any other purpose."

You may not infer from such evidence that the defendant is of a character that would commit such an act. The evidence may be considered only to the extent that it may show the elements that the State is required to prove in the crimes charged in the case now on trial. Such evidence, if any, may not be considered by you for any other purpose. The defendant is on trial for the offenses charged in this bill of indictment only and not for any other act. Before you may consider any other alleged act for the limited purposes stated, you must first determine whether the accused committed the other alleged act. If so, you must then determine whether the act sheds any light on the elements of the offense for which the act was admitted and the crimes charged in the indictment in this trial. Remember to keep in mind the limited use and the prohibited use of this evidence about another act of the defendant. By giving this instruction, the court in no way suggests to you that the defendant has or has not committed any other act nor whether such act, if committed, proves anything. This is solely a matter for your determination.

In his motion for new trial, Ash again challenged the admissibility of this evidence. The trial court again rejected Ash's argument, and its order denying Ash's motion for new trial stated that "the 2009 conviction is relevant to both motive and intent." Specifically, the trial court agreed with the State's argument that the other acts evidence was "relevant to showing Ash's intent to perpetuate violence by using a firearm when he feels he has been

wronged" and relevant for motive because the evidence "help[s] demonstrate that Ash responds with violence, without reasonable concern for the consequences, if he feels publicly disrespected." Ash contends that these evidentiary rulings were erroneous.

"On appeal, a trial court's decision to admit evidence pursuant to OCGA § 24-4-404 (b) is reviewed for a clear abuse of discretion." *Brannon v. State*, 298 Ga. 601, 606 (4) (783 SE2d 642) (2016).

> Under OCGA § 24-4-404 (b), "(e)vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith," but such evidence is admissible for other purposes, including to prove intent and motive.

*Kirby v. State*, 304 Ga. 472, 479 (4) (819 SE2d 468) (2018). However, "[d]espite its inclusive nature, Rule 404 (b) prohibits the admission of such evidence when it is offered *solely* for the impermissible purpose of showing a defendant's bad character or propensity to commit a crime." (Citation and punctuation omitted; emphasis in original.) *Thompson v. State*, 302 Ga. 533, 539 (III) (A) (807 SE2d 899) (2017).

Although the characterizations of the relevance of this

21

evidence offered by the State and the trial court strongly suggest it was intended to demonstrate Ash's propensity for violence, see *Kirby*, 304 Ga. at 487 (4) (b) (noting that evidence of a defendant's "inclination" toward violence "is a classic improper propensity argument"), we need not decide whether the trial court abused its discretion by admitting this evidence, because any such error was harmless. The test for determining whether a nonconstitutional evidentiary error was harmless is whether it is highly probable that the error did not contribute to the verdict. See *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019). In conducting this harmless-error review, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." (Citation and punctuation omitted.) Id.

We first note that the trial court's instructions to the jury indicated that the only specific purpose for which the evidence of the 2009 incident and convictions could be considered was to show intent. Thus, as Ash concedes, although the trial court ruled on multiple occasions that the evidence was also admissible to show

22

motive, the jury was never instructed as to that use of the evidence, and the jury is presumed to follow the instructions of the trial court absent clear evidence to the contrary. See *Horton v. State*, 310 Ga. 310, 320 (3) (a) (849 SE2d 382) (2020). Ash has presented no evidence that the jury deviated from the trial court's instructions and considered this evidence in regard to motive. Thus, to the extent the trial court's determination that the evidence was admissible as to the issue of motive constituted an abuse of discretion, any such error was harmless.

Any error in admitting the evidence for the purpose of showing intent was likewise harmless. The record reflects that the 2009 convictions served as the predicate felonies for the count of possession of a firearm by a convicted felon with which Ash was charged. Also, in his interview with the detective, which was played for the jury, Ash admitted to being a convicted felon. Thus, Ash's prior convictions and the nature of the charges were properly before the jury for other reasons, leaving only Colton's description of those events as additional evidence for the jury to consider. And Colton's

23

description of those events was not of a character that would lead a reasonable juror to seek to "punish" Ash in this case again for the actions described related to the prior case. *Kirby*, 304 Ga. at 485 (4) (a) (i). Finally, we note that neither the prosecutor nor Ash's counsel devoted much attention to this evidence in closing arguments.

Under these circumstances, the evidence of the 2009 incident and convictions "was not unduly prejudicial, particularly in light of the trial court's instructions limiting the jury's consideration of the evidence to a matter that turned out to be of no importance and the fact that the jury learned that [Ash] had pled guilty to his prior crimes[.]" *Tiraboschi v. State*, 312 Ga. 198, 200 (2) (862 SE2d 276) (2021); see also *Howell v. State*, 307 Ga. 865, 875 (3) (838 SE2d 839) (2020) (considering the trial court's instructions on the limited use of other acts evidence in determining harmless error, because "[w]e ordinarily presume that jurors follow their instructions"); *Kirby*, 304 Ga. at 485 (4) (a) (i) (explaining that the risk that a jury may convict a defendant not for the offense charged but for his extrinsic conduct is greater where the extrinsic conduct was not already the subject of

24

a conviction).

Rather, the central issue in the case was whether it was Ash who shot and killed Shaw. On that issue, the evidence against Ash was strong. Minor testified at trial that Ash told him he shot and killed Shaw, and Minor's testimony was corroborated by physical evidence and statements by other witnesses.

Further, the State introduced the testimony of multiple witnesses regarding Ash's anger toward Shaw and his suspicions that Shaw was responsible for stealing Jonathan's drugs. In the days leading up to the murder, witnesses observed several confrontations between Ash and Shaw, including at least one visit where Shaw refused Ash entry to his apartment. Denise Gowdy's testimony about Shaw's refusal to let Ash enter also helped to explain why, as Minor testified, Ash would need to "finesse" his way into Shaw's apartment on the night of the shooting.

In addition, Cook's testimony placed Ash and a white SUV at the scene of the shooting around the time it occurred. Although his statements were confusing and contradictory and his credibility was

aggressively questioned at trial, at least one of the descriptions of the person he identified as "Big Boy" led a detective to conclude that he had identified Ash. Moreover, although Stevens offered a benign explanation for washing Ash's clothes on the night of the shooting, there was also evidence suggesting that Stevens destroyed the clothes Ash had been wearing that night. In his interview with the police, Ash gave inconsistent stories about his movements and whereabouts on the evening of the shooting.

Given this evidence, it is highly probable that any error in admitting the other acts evidence for the jury to consider in regard to intent did not contribute to the verdicts. See *Jackson*, 306 Ga. at 81 (2) (concluding that the erroneous admission of evidence of a prior shooting did not contribute to the jury's verdict "given the overall strength of the other evidence" of guilt); see also *Keller v. State*, 308 Ga. 492, 503 (5) (842 SE2d 22) (2020) (determining that evidentiary error was harmless "in light of the strong evidence of [appellant's] guilt"). Thus, this enumeration of error fails.

3. Ash also contends that the trial court improperly admitted

hearsay testimony from Terrell concerning statements Shaw made to him. Before trial, the State filed a notice of intent to introduce hearsay evidence pursuant to OCGA § 24-8-807 ("Rule 807"), which is also known as the "residual" hearsay exception.[18] Specifically, the State sought to admit testimony about Shaw's statements to Terrell that Jonathan and Shaw were both arrested for marijuana and cash found in Jonathan's car, that Ash told Shaw that Shaw "needed to own up" for the marijuana found when he and Jonathan were arrested, that Shaw was not going to claim the drugs were his "right then," and that Shaw was "going to wait and see."

Over Ash's objection, the trial court permitted the State to question Terrell about Shaw's statements to him under the residual hearsay exception, determining that, under the totality of the

---

[18] OCGA § 24-8-807 provides, in relevant part:

A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that: (1) The statement is offered as evidence of a material fact; (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence. . . .

27

circumstances, there were particularized guarantees of the statements' trustworthiness, Shaw was clearly unavailable to testify at trial due to his death, and the statements were relevant to a material fact in the case. On appeal, Ash claims that the trial court abused its discretion by admitting Shaw's statements to Terrell under the residual hearsay exception. We disagree.

(a) In ruling upon Ash's residual hearsay claim in his motion for new trial, the trial court referred to this Court's decision in *Griffin v. State*, 280 Ga. 683, 684 (1) (631 SE2d 671) (2006), which the trial court noted applied the "necessity" exception to the hearsay rule set forth in former OCGA § 24-3-1 (b). However, the General Assembly did not carry over that exception to the hearsay rule into the current Evidence Code. While eliminating the "necessity" exception, the General Assembly modeled the current version of Rule 807 — which took effect on January 1, 2013, and applies to all trials conducted after that date, including the trial in this case — on Federal Rule of Evidence 807. See *State v. Holmes*, 304 Ga. 524, 529 (2) (a) (820 SE2d 26) (2018).

As we have noted many times since the current Evidence Code's enactment, when Georgia courts consider the meaning of Evidence Code provisions that the General Assembly borrowed from the Federal Rules of Evidence, they should be guided by the "decisions of the federal appeals courts construing and applying the Federal Rules, especially the decisions of the Eleventh Circuit." (Citation and punctuation omitted.) *Jacobs v. State*, 303 Ga. 245, 249 (2) (811 SE2d 372) (2018). Cases decided under the "necessity" exception to the hearsay rule in Georgia's former Evidence Code are thus not applicable to Rule 807's interpretation and should not be relied on by trial courts in determining whether to admit evidence. See *Holmes*, 304 Ga. at 530 (2) (a).

However, despite its citation to *Griffin*, the trial court's order denying Ash's motion for new trial on this ground relied primarily on its assessment of "guarantees of trustworthiness" and the other factors outlined in Rule 807. We also note that in their arguments before the trial court in the pre-trial hearing on this issue both Ash and the State discussed the need to establish guarantees of

29

trustworthiness surrounding Shaw's statements to Terrell.

The trial court ultimately applied the appropriate evidentiary standard despite its citation of a case construing the former Evidence Code. It is therefore unnecessary for us to vacate the trial court's denial of Ash's motion for new trial on the sole basis that the trial court considered a decision under the former Evidence Code instead of relying on decisions construing Rule 807 under the current Evidence Code. See *Reyes v. State*, 309 Ga. 660, 667 (2) (a) (847 SE2d 194) (2020) (holding that even though the trial court cited cases construing the former Evidence Code, because the trial court applied the residual factors, in substance, remand was unnecessary). Compare *Holmes*, 304 Ga. at 530 (2) (a) (where trial court did not apply the proper evidentiary standard in analyzing evidence's admissibility under Rule 807, this Court vacated the order, remanded the case, and directed the trial court to apply the correct standard).

(b) We now consider whether the trial court abused its discretion by admitting the statements at issue under Rule 807. See

*Tyner v. State*, 305 Ga. 326, 330 (2) (825 SE2d 129) (2019) (admission of evidence under Rule 807 reviewed for abuse of discretion). The exception states in relevant part:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that: (1) The statement is offered as evidence of a material fact; (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence. . . .

OCGA § 24-8-807.

Ash does not dispute that the State offered the statements at issue as evidence of material facts, that the statements were more probative on the points for which the State offered them than any other evidence the State could have reasonably procured, or that the statements' admission would best serve the general purpose of the evidence rules and the interests of justice. Instead, Ash contends only that the statements did not have sufficient "guarantees of trustworthiness" to be properly admitted under the residual hearsay

exception. We disagree.

We first note that the General Assembly designed the residual hearsay exception embodied in Rule 807 "'to be used very rarely, and only in exceptional circumstances.'" *Jacobs*, 303 Ga. at 249 (2) (quoting *Rivers v. United States*, 777 F3d 1306, 1312 (II) (11th Cir. 2015)). The rule applies "only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." (Citation and punctuation omitted.) *Jacobs*, 303 Ga. at 249 (2). Such guarantees of trustworthiness

> must be equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, and statements of personal or family history. These categories of hearsay have attributes of trustworthiness not possessed by the general run of hearsay statements that tip the balance in favor of introducing the information if the declarant is unavailable to testify. And they are all considered sufficiently trustworthy not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made.

(Citations and punctuation omitted.) Id. However,

> [t]his Court is particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction that the

32

court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.

(Citation and punctuation omitted.) *Holmes*, 304 Ga. at 529 (2) (a).

Here, the trial court determined that several factors weighed in favor of finding that Shaw's statements to Terrell were trustworthy. The trial court noted that Terrell testified in a pre-trial hearing regarding the residual hearsay testimony.[19] Terrell testified that Shaw was his lifelong friend "ever since elementary school." Terrell and Shaw met in the third grade, and they were friends until Shaw's death. The pair talked to each other daily and shared the personal details of their lives with each other. Terrell described Shaw as his "best friend" that he "loved and trusted." Terrell and Shaw continued this close relationship until Shaw's death.

In light of the evidence of their long and close friendship and the circumstances in which Shaw made the statements at issue to Terrell, we cannot say that the trial court abused its discretion by

---

[19] The trial court initially determined that Shaw's statements would not be admitted pursuant to Rule 807. Before the start of Ash's second trial, the trial court reversed that decision following a hearing on a pre-trial motion for reconsideration filed by the State.

admitting the statements under Rule 807. See, e.g., *Rawls v. State*, 310 Ga. 209, 215 (3) (i) (850 SE2d 90) (2020) (noting that the "close relationship" between victim and witness gave statements made to witness by victim "sufficient guarantees of trustworthiness to be admissible under Rule 807"); *Jacobs*, 303 Ga. at 250-251 (2) (no abuse of discretion where statements made to close friends concerned history of conflict between victim and perpetrator).

Moreover, although Terrell, like many of the witnesses who testified at trial, had his credibility and motives for testifying questioned by the defense, his credibility was not at issue in determining whether to admit Shaw's statements to him under Rule 807. As we discussed in *Jacobs*, the trial court must make its determination of the trustworthiness of the hearsay statements at issue "not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made." (Citations and punctuation omitted.) 303 Ga. at 249 (2). Because the record is clear that this was the trial court's focus in reaching its ruling with regard to the admission of the

34

statements and because the trial court's decision to admit this evidence did not otherwise constitute an abuse of discretion, this enumeration of error fails. See *Reyes*, 309 Ga. at 673-674 (3) (b).

4. Ash also claims that his right to due process was violated when the State "improperly destroyed evidence it knew to be exculpatory." Specifically, Ash claims that during his interview with the police on April 5, 2013, he showed the lead detective a picture on his cell phone showing that he was at the Brazilian Club on the night of Shaw's shooting. Ash further claims that after confiscating the cell phone incident to his arrest, the State, in bad faith, destroyed the phone, even though it contained exculpatory evidence, namely the photograph Ash showed the detective. The trial court determined that Ash had not demonstrated a due process violation, and we agree.

In evaluating whether a defendant's constitutional right to due process was violated when the State failed to preserve evidence that could be exculpatory,

a court must determine both whether the evidence was

35

material and whether the police acted in bad faith in failing to preserve the evidence. To meet the standard of constitutional materiality, the evidence must possess an exculpatory value that was apparent before it was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

(Citations and punctuation omitted.) *Goins v. State*, 310 Ga. 199, 202 (3) (850 SE2d 68) (2020); see also *State v. Mussman*, 289 Ga. 586, 590 (2) (713 SE2d 822) (2011) (applying this test where the State failed to preserve evidence that "could have been exculpatory, but where it is not known that the evidence would have been exculpatory" (emphasis omitted)). This test is ordinarily applied when State officials dispose of potential evidence that was previously in the State's actual or constructive possession. See, e.g., *Arizona v. Youngblood*, 488 U. S. 51, 52-53 (109 SCt 333, 102 LE2d 281) (1988) (sexual assault kit not fully tested and victim's clothing not refrigerated); *California v. Trombetta*, 467 U. S. 479, 482 (104 SCt 2528, 81 LE2d 413) (1984) (suspected drunk drivers' breath samples not preserved by arresting officers); *Hill v. State*, 308 Ga. 638, 648-649 (3) (842 SE2d 853) (2020) (correctional officer's video of

36

post-crime search lost); *Clay v. State*, 290 Ga. 822, 839-843 (5) (725 SE2d 260) (2012) (defendant's blood samples destroyed). Cf. *Krause v. State*, 286 Ga. 745, 752 (8) (691 SE2d 211) (2010) (applying the test to a baseball bat seen in a crime scene photograph but not taken into evidence).

In his motion for new trial, Ash claimed that the State violated his due process rights by improperly and in bad faith destroying his cell phone, which the State allegedly knew contained exculpatory evidence before its destruction. The record shows that during the investigation of Shaw's murder, the lead detective interviewed Ash on April 5, 2013. Among other stories about the night of Shaw's shooting, Ash told the detective that he had an alibi in the form of a photograph taken at the Brazilian Club that night. Ash then showed the detective a photograph he "had received" which he said was taken at the club that night. In response, the detective challenged Ash to provide information about his whereabouts between 2:00 a.m. and 7:00 a.m. on February 21.

After his interview with the detective, Ash was arrested.

Incident to the arrest, the detective collected Ash's cell phone. Pursuant to Atlanta Police Department procedures, the detective generated a bar code for the phone on April 5, but he did not turn the phone over to the department's property control unit until July 22, 2013, in apparent violation of police department guidelines. During that time, the detective asked Ash's cell phone service provider to unlock his phone. A representative of the service provider indicated that it would only do so after being presented with a valid search warrant. The detective later obtained a search warrant for the phone but never filed a return.[20]

In addition, when the detective later turned the phone over to the department's property control unit, he designated the phone as "property" rather than "evidence." Under police department guidelines, "property" was to be retained by the police department

---

[20] An employee of the Clerk of Fulton County Superior Court testified that, "[n]ormally, when the affidavits and applications for a search warrant are filed with our court, they are filed with a return attached. And this record has no return attached." The record contains a form Fulton County Superior Court "return," which is a document that shows, among other information, whether and where the warrant was executed, with whom or where a copy of the warrant was left, and an inventory of any items seized in any search that was conducted pursuant to the warrant.

for at least 90 days before being destroyed, based on the date listed with the bar code, and police personnel were to, "if possible," contact the property owner and notify him that the property could be picked up at the property control unit. In early August 2013, the police department sought court permission pursuant to OCGA § 17-5-54 (e)[21] to destroy Ash's cell phone, and a court order granting such permission was issued on August 20. Ash's cell phone was destroyed sometime in early October 2013.[22] A notation on the document showing the chain of custody of the phone indicates that the phone was destroyed before the police notified Ash that the phone could be

---

[21] OCGA § 17-5-54 (e) provides, in pertinent part, as follows:

For any unclaimed personal property that is not a firearm, the sheriff, chief of police, or other executive officer of a law enforcement agency shall make application to the superior court for an order to retain, sell, or discard such property. In the application the officer shall state each item of personal property to be retained, sold, or discarded. . . . Upon the superior court's granting an order which authorizes that the property be discarded, the law enforcement agency shall dispose of the property as other salvage or nonserviceable equipment. . . .

[22] Ash's counsel noted in the hearing on the motion for new trial that the police department's procedures required the department to make efforts to notify Ash before destroying the phone but that he was never notified. Ash concedes that, before its destruction, he never asked that the phone be returned to him or that he be allowed to examine it.

39

picked up.

Three witnesses who were in the chain of custody of the phone testified that they had not examined the contents of the phone and did not know whether the phone contained exculpatory evidence. The detective did not testify at the hearing on the motion for new trial.

At the hearing, Ash presented the testimony of an expert who stated that it would have been possible to extract "metadata" relating to the photograph, including GPS coordinates, the date and time the photo was captured, and the date and time the photo was digitized, from Ash's phone. The expert testified that access to this data would "greatly" improve the ability to determine the precise location of Ash's cell phone at various times. Ash's mother also testified at the hearing that she picked up some of Ash's personal property from the Fulton County Jail on May 23, 2016, and that she would have picked up his cell phone from the jail had she been asked to do so.

In its order denying Ash's motion for new trial, the trial court

rejected Ash's claim, finding in part that, "[n]o testimony given by any witness over the two days of hearings on the amended motion for new trial demonstrated bad faith by anyone." The trial court also noted that the photograph had been taken by someone else and was consistent with the State's theory of Ash's whereabouts the night of the shooting, including his presence at the Brazilian Club where Ash claimed the photo was taken. The trial court thus determined that the photograph was "not exculpatory, but rather inculpatory."

To begin with, we agree with the trial court that Ash has not shown that the photograph's exculpatory value, if any, was apparent before it was destroyed. See *Ballard v. State*, 285 Ga. 15, 16 (2) (673 SE2d 213) (2009). That a piece of evidence may be "potentially useful" in a defendant's attempt at exoneration is insufficient to sustain a claim that the defendant has suffered an abridgment of due process due to the evidence's destruction or loss. *Krause*, 286 Ga. at 752 (8). The key is the evidence's "apparent exculpatory value" before its destruction or loss, and this Court has defined "apparent" in this context as "readily seen; visible; readily understood or

41

perceived; evident; obvious." (Citation and punctuation omitted.) *State v. Mizell*, 288 Ga. 474, 476 (2) (705 SE2d 154) (2010).

Although Ash argues that the exculpatory value of the picture he showed the detective was readily apparent and that the detective's actions in seeking to unlock the phone and obtain a search warrant for it demonstrate as much, we are not persuaded that Ash has demonstrated that this evidence satisfies the exculpatory prong of the materiality test. Based on the record before this Court, we cannot conclude that the cell phone's exculpatory value was obvious or evident to the detective or any other police personnel who handled the phone before its destruction. See *State v. Miller*, 287 Ga. 748, 755 (699 SE2d 316) (2010) (evidence on seized cell phone was not constitutionally material where "it was [not] apparent to police or anyone else involved in the seizure, custody, or disposition of the cell phone that it could possibly aid [the defendant] in the defense of any criminal charges").

To the contrary, the evidence presented at the hearing on the motion for new trial suggests that the detective never believed the

photograph to be exculpatory and that other police personnel never examined the phone to determine whether it contained exculpatory evidence. Consequently, the trial court did not err in determining that the exculpatory value of the evidence was not apparent. See *Hill*, 308 Ga. at 649 (3) (holding that, even if an unpreserved video would have shown what the appellant claims it would have shown, it was not material because its exculpatory value was not apparent before it was lost); *Clay*, 290 Ga. at 842 (5) (c) (rejecting claim of due process violation based on destruction of evidence and noting that appellant "overstate[d] the potential exculpatory value of the [destroyed evidence]").

We also agree with the trial court's determination that the police did not act in bad faith. As the United States Supreme Court discussed in *Youngblood*,

> requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

488 U. S. at 58. Here, as the trial court found, there was no evidence that any member of the police department who handled Ash's cell phone after it was confiscated believed there was exculpatory evidence on the phone. Only the detective was aware that Ash even claimed to have potentially exculpatory evidence on the phone.

Ash makes much of the evidence that the detective and other members of the police department appear to have violated a number of Atlanta Police Department policies in the handling and disposition of the phone, particularly the detective's lengthy delay in turning the phone over to the property control unit, his "mislabeling" of the phone as "property" rather than "evidence," and the destruction of the phone before notifying Ash that it could be picked up. However,

> [e]ven if we were to assume that the State's handling of the [phone] indicated careless, shoddy and unprofessional investigatory procedures, it did not indicate that the police in bad faith attempted to deny [Ash] access to evidence that they knew would be exculpatory.

(Citation and punctuation omitted.) *Hill,* 308 Ga. at 649 (3). Ash

44

presented no evidence that the detective's actions or the police department's eventual destruction of the cell phone were motivated by a conscious desire to deny Ash the use of the photograph or other evidence connected with the phone, including metadata associated with the photograph, or that anyone in the chain of custody was even aware that the phone contained allegedly exculpatory evidence. Instead, the police department's actions are best characterized "as an unfortunate series of mishandlings, mistakes, and negligence." *Miller*, 287 Ga. at 755. Such actions cannot support a claim that Ash's right to due process was violated, and this claim fails.

5. Ash next argues that the trial court plainly erred by failing to charge the jury on the "full defendant's confession corroboration" instruction and by failing to instruct the jury that the testimony of an accomplice must be corroborated. We reject both contentions.

(a) Ash first contends that the trial court erred in the instruction on confession corroboration when it omitted one sentence from the current pattern instruction. Because Ash's trial counsel did not request the jury instruction on confession corroboration and did

not object to the jury charge as given by the trial court, we review

this omission only for plain error. See OCGA § 17-8-58 (b) ("Failure

to object in accordance with subsection (a) of this Code section shall

preclude appellate review of such portion of the jury charge, unless

such portion of the jury charge constitutes plain error which affects

substantial rights of the parties. Such plain error may be considered

on appeal even if it was not brought to the court's attention as

provided in subsection (a) of this Code section.").

This Court has established the following test for plain error:

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citations and punctuation omitted.) *Simmons v. State*, 299 Ga. 370,

373 (2) (788 SE2d 494) (2016). This Court does not have to analyze all elements of the plain-error test where an appellant fails to establish one of them. See *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018). As we have noted, satisfying all four prongs of this test "is difficult, as it should be." (Citation and punctuation omitted.) *Clarke v. State*, 308 Ga. 630, 637 (5) (842 SE2d 863) (2020).

> In this case, the trial court instructed the jury to

> consider with great care and caution the evidence of any out-of-court statement allegedly made by the defendant offered by the State. The jury may believe any such statement in whole or in part, believing that which you will find to be true and rejecting that which you find to be untrue. You alone have the duty to apply the general rules for testing the believability of witnesses and to decide what weight should be given to all or any part of such evidence.

The trial court omitted the following statements from the pattern jury instruction:

> A defendant's out-of-court statement that is not supported by any other evidence is not sufficient to justify a conviction, even if you believe that unsupported statement. However, proof by other evidence beyond a reasonable doubt that the crime alleged has been

47

committed may constitute supporting evidence of a defendant's statement, if any, should you so find. The law does not fix the amount of supporting evidence necessary. You must determine whether or not other evidence sufficiently supports a defendant's statement so as to justify a conviction. If you find that there was a statement made by the defendant that was supported by other evidence, the degree of proof necessary to convict is that you be satisfied of the guilt of the defendant beyond any reasonable doubt.

See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.32.70 (Jan. 2016); see also OCGA § 24-8-823 ("All admissions shall be scanned with care, and confessions of guilt shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction.").[23] Ash argues that the omission of the first sentence of this portion of the pattern jury instruction constituted plain error.

However, despite this omission from the pattern instruction, we cannot say that the trial court's charge constituted a legal error that was "clear or obvious, rather than subject to reasonable dispute." *Cheddersingh v. State*, 290 Ga. 680, 683 (2) (724 SE2d 366)

---

[23] The exact text of former OCGA § 24-3-53 was carried forward into the current Evidence Code and codified as OCGA § 24-8-823.

(2012). We have previously held that there was no plain error where the trial court failed to give the full text of a different pattern instruction on consideration of the voluntariness of the defendant's statements in its charge to the jury where, as here, the charge, as given, "instructed the jury to apply the general rules for testing the believability of witnesses and for deciding what weight, if any, to give to all or any part of a statement." *Martin v. State*, 306 Ga. 538, 544 (4) (832 SE2d 402) (2019).

And although the trial court's failure to charge the jury regarding the need to corroborate a defendant's out-of-court statement has been raised as plain error in prior appeals before this Court, it does not appear that we have squarely addressed whether the failure to instruct the jury that an uncorroborated statement is insufficient to warrant a conviction is clearly and obviously erroneous. See, e.g., *Hood v. State*, 311 Ga. 855, 866-867 (2) (860 SE2d 432) (2021) (pretermitting whether the failure to give the instruction constituted clear and obvious error and determining that the outcome was not likely affected by the omission of the

49

instruction); *Horton*, 310 Ga. at 322 (3) (b) (same); *Clarke*, 308 Ga. at 637 (5) (same); *English v. State*, 300 Ga. 471, 473-475 (2) (796 SE2d 258) (2017) (same); *Rashid v. State*, 292 Ga. 414, 422 (7) (737 SE2d 692) (2013) (same).[24] Additionally, the Court of Appeals has held that, absent a timely request for a similar form of this instruction under the identical language of former OCGA § 24-3-53, there is no error so long as there was evidence presented at trial corroborating the defendant's statement. See *Herrington v. State*, 243 Ga. App. 265, 266-267 (3) (533 SE2d 133) (2000).[25]

---

[24] Although it did not appear to explicitly consider the issue under the plain-error framework, the Court of Appeals reached a similar conclusion in *Armstrong v. State*, 325 Ga. App. 33, 36-37 (2) (752 SE2d 120) (2013), and *Farley v. State*, 314 Ga. App. 660, 666-667 (5) (725 SE2d 794) (2012), when it held in each case that there was no reversible error in failing to sua sponte instruct the jury regarding corroboration of a confession where the defendant did not request the instruction and his statement was corroborated by other evidence.

[25] We recognize that this holding is in tension with our current approach to assessing whether the trial court erred by not giving certain instructions to the jury based on the text of statutes requiring corroboration. Tellingly, *Herrington* cites *Fleming v. State*, 269 Ga. 245, 247 (2) (497 SE2d 211) (1998), in support of the proposition that no corroboration instruction need be given where there is sufficient corroborating evidence. *Fleming* dealt with whether the trial court was required to give an accomplice-corroboration instruction requested by the defendant. See id. at 247 (2); former OCGA § 24-4-8. We held in *Fleming* that no instruction was required because the State presented evidence corroborating the alleged accomplice's testimony. See id. However, in

The trial court did not commit a clear and obvious error here because "[a]n error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point[.]" *Wilson v. State*, 291 Ga. 458, 460 (729 SE2d 364) (2012) (holding that it was not plain error to fail to give jury instruction even where appellant's argument establishing error "may be meritorious"). Because Ash has pointed to no precedent holding that the omission of this sentence from the pattern instruction constitutes error under these circumstances, and because existing

---

*Hamm v. State*, 294 Ga. 791, 796 (2) (756 SE2d 507) (2014), we overruled *Fleming* and other decisions from this Court and the Court of Appeals applying that rule, reasoning instead that the failure to give the accomplice-corroboration instruction is error when there is at least slight evidence that a witness was an accomplice. We have since applied this rule in the plain-error context, holding that it is clear and obvious error for a trial court to fail to give the accomplice-corroboration instruction sua sponte when there is evidence that a witness was an accomplice. See, e.g., *Stanbury v. State*, 299 Ga. 125, 129-130 (2) (786 SE2d 672) (2016). *Herrington* thus appears to deviate from this Court's more recent decisions emphasizing the need for a jury instruction on corroboration where a statutory provision indicates that corroboration is required and there is slight evidence to support the instruction.

However, even if *Herrington* is no longer good law — a question we need not definitively resolve today — for purposes of this case, it is sufficient that it has not been overruled. *Herrington* shows that, under existing precedent, the trial court did not clearly and obviously err in failing to instruct the jury that a defendant's out-of-court statement that is not supported by any other evidence is not sufficient to justify a conviction.

legal authority stands for the contrary position, whether the trial court should have instructed the jury on the full text of the pattern confession-corroboration instruction must be considered "subject to reasonable dispute and thus cannot constitute plain error." (Citation and punctuation omitted.) Id. See also *Walter v. State*, 304 Ga. 760, 767 (3) (b) (822 SE2d 266) (2018) (noting that appellant had "cite[d] no precedent" requiring the instruction at issue).

(b) Ash also claims that the trial court plainly erred by failing to charge the jury on the need for corroboration of accomplice testimony, as a jury could have found that Terrell and Minor were accomplices to Shaw's murder. We disagree.

The trial court instructed the jury on this issue as follows:

> The testimony of a single witness, if believed, is sufficient to establish a fact. Generally, there is no legal requirement of corroboration of a witness provided you find the evidence to be sufficient.

Ash did not request an accomplice-corroboration charge, and the trial court did not instruct the jury that there must be independent corroboration of an accomplice's testimony before it can be

considered. After the trial court concluded the jury charges, Ash's counsel stated that she had no objections to the charges as given. We thus review this claim only for plain error. See OCGA § 17-8-58 (b).

OCGA § 24-14-8 provides, in relevant part, that "[t]he testimony of a single witness is generally sufficient to establish a fact. However, in . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient." Under this rule, the Court has stated that

> where an accomplice testifies at trial, a jury may not rely solely on the testimony to find any fact necessary to sustain the defendant's felony conviction. Instead, the existence of any such fact must also be supported either by the testimony of an additional witness or by other, independent evidence that corroborates the accomplice's testimony.

(Citation and punctuation omitted.) *State v. Johnson*, 305 Ga. 237, 240 (824 SE2d 317) (2019).

> In considering whether a witness is an accomplice, we look to the definition of party to a crime found in OCGA § 16-2-20. Under that definition, there must be some evidence showing that the defendant shared a common criminal intent to commit the crimes in question with the actual perpetrators. Moreover, evidence of an individual's actions and knowledge after the commission of the crimes

53

is insufficient to satisfy the standard of OCGA § 16-2-20. At best, it would show that the individual was an accessory after the fact, not a party to the crimes. At common law and under modern practice, an accessory after the fact is not considered an accomplice to the underlying crime itself, but is guilty of a separate, substantive offense in the nature of obstruction of justice.

(Citation, punctuation and emphasis omitted.) *Horton*, 310 Ga. at 323 (3) (c).

Here, based on the standard outlined above, there was no evidence presented at trial that obviously called for the giving of an accomplice-corroboration charge. Although Ash notes that both Terrell and Minor believed Shaw should have taken responsibility for Jonathan Ash's drug charges, Ash has pointed to no evidence that Minor or Terrell shared Ash's intent to murder Shaw or that they aided or abetted the killing in any way. Ash also notes that Cook's testimony established that there was someone with Ash at Shaw's apartment complex around the time Shaw was killed. However, there was no evidence presented at trial that this person was either Terrell or Minor. By contrast, the evidence indicates only that Terrell and Minor heard about Shaw's killing later. Moreover,

although Terrell was with Ash on the night of the shooting and traveled to Florida with him the following day, neither the evidence presented at trial nor the State's closing argument pointed to Terrell as an accomplice. Rather, the State suggested that Ash contacted Terrell and asked to meet him merely as a way of establishing an alibi the night of the shooting.

Thus, while there might have been a slight evidentiary basis for Ash to have requested a charge on accomplice corroboration, Ash has failed to show that the trial court made a clear and obvious error by not sua sponte instructing the jury on accomplice corroboration. See *Horton*, 310 Ga. at 324 (3) (c). This enumeration of error fails.

6. Finally, Ash argues that the cumulative effect of the errors he has enumerated prejudiced him and that he is entitled to a new trial. To establish cumulative error, Ash must show that "at least two errors were committed in the course of the trial; [and] considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [Ash] a fundamentally fair trial." (Citation and punctuation omitted.) *State*

55

*v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020). However, when reviewing a claim of cumulative prejudice, "[w]e evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors." *Scott v. State*, 309 Ga. 764, 771 (3) (d) (848 SE2d 448) (2020).

This Court has assumed for purposes of analysis that the trial court made only a single error in this case: the trial court's admission of Ash's 2009 convictions and testimony about the incident that led to those convictions. However, because we determined that any error in the admission of that evidence was harmless, and because we have not identified any other error on the part of the trial court, we have no basis for evaluating cumulative effect. See *Flood v. State*, 311 Ga. 800, 808-809 (2) (d) (860 SE2d 731) (2021). This argument fails.

*Judgment affirmed. All the Justices concur.*

Decided November 2, 2021.

Murder. Fulton Superior Court. Before Judge Farmer.

*Jackie L. Tyo*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Richard B. Caplan, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General*, for appellee.